# IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

## CENTRAL DIVISION

| | |
|---|---|
| **STEPHANIE SINGER,**<br><br>  **Plaintiff,**<br><br>vs.<br><br>**DEPARTMENT OF HEALTH AND HUMAN SERVICES and NATIONAL HEALTH SERVICE CORPS.,**<br><br>  **Defendants.** | **MEMORANDUM DECISION AND ORDER**<br><br>Case No. 2:07CV321DAK |

This matter is before the court on Defendants Department of Health and Human Services and National Health Service Corps ("NHSC") and Counterclaim Plaintiff United States of America's Motion for Summary Judgment.[1]  The court held a hearing on the motion on July 8, 2009.  At the hearing, Plaintiff was represented by Donald J. Winder, and Defendants were represented by Jeannette F. Swent.  The court heard oral argument and took the motions under advisement.  The court has carefully considered all pleadings, memoranda, and other materials submitted by the parties.  The court has further considered the law and facts relevant to the parties' motions.  Now being fully advised, the court enters the following Memorandum Decision and Order.

---

[1] The court will refer to Defendants and Counterclaim Plaintiff collectively as Defendants.

**BACKGROUND**

Singer is an obstetrican/gynecologist ("OBGYN") who now practices in Park City, Utah. Singer graduated from medical school and did an OBGYN residency in New York. After her residency, on or about August 1, 1997, Singer began work at Wyckoff Hospital in Brooklyn, New York. Soon thereafter, she learned about the National Health Service Corps ("NHSC") Loan Repayment Program ("LRP"), which recruits physicians to work in inner cities and remote rural areas where residents lack adequate access to health care in exchange for the repayment of qualifying educational loans. Congress enacted the NHSC LRP in 1987 as an adjunct to the existing NHSC Scholarship Program to assure that health care providers would be available to mitigate the "health care crisis for the unserved residents of health manpower shortage areas." H.R. Rep. No. 100-252, at 8-10 (1987).

On January 30, 1998, Singer submitted her application materials for the LRP. Singer admits that included with the application materials she received was the Applicant Information Bulletin ("AIB"). The AIB states that the contract would not take effect until an HHS official countersigned the LRP contract: "Applicants become participants in the NHSC/LRP on the date the Designee of the Secretary of the Department of Health and Human Services countersigns the NHSC/LRP Federal Contract or the start date of full-time employment at an NHSC/LRP site, whichever is later."

Prior to submitting her application, Singer signed the LRP contract on January 20, 1998. An HHS official signed her contract on March 18, 1998. Singer received the fully executed LRP contract with a cover letter from HHS, dated March 25, 1998. The contract and the cover letter state that the contract obligated Singer to serve as a full-time health professional at a site

approved by the NHSC for two years.  The cover letter sets out the specific dates for this two-year period as March 18, 1998 to March 17, 2000.  On or about April 14, 1998, Singer also signed a Private Practice Assignment Agreement with the NHSC in which she agreed, among other things, to serve as a full-time OBGYN at Wyckoff until March 17, 2000.  Pursuant to the LRP contract, the NHSC provided $50,000 to Singer for repayment of her student loans.

The terms of a NHSC LRP contract are set by statute.  *See* 42 U.S.C. § 254*l*-1(f).  Included in the contract terms is a statement of the damages to which the United States is entitled if an individual breaches the service obligation.  *See id.* § 254*l*-1(f)(4).  Singer's LRP contract recited the statutory default provisions in effect at the time.

When Singer entered into her LRP contract, the statute provided that if the participant failed "to complete such service obligation, the Untied States shall be entitled to recover from the individual an amount equal to the sum of . . . the total of the amounts paid by the United States . . . on behalf of the individual for any period of obligated service; and an amount equal to the unserved obligation penalty."  *Id.* § 254o(c)(1).  The penalty was defined as "the product of the number of months of obligated service that were not completed by an individual, multiplied by $1,000."  *Id.* § 254o(c)(1)(A).

 Despite her contractual obligation through March 17, 2000, Singer left her job at Wycoff on September 22, 1999.  On September 24, 1999, Singer sent a letter to the NHSC stating that she discontinued her employment at Wyckoff "[d]ue to extreme and unfortunate circumstances."  She stated that she "would appreciate it if [her] contract requirement could be fulfilled as of this time."  Although she had agreed to work at the hospital for two years from March 1998, she had worked at the hospital for six months prior to entering the LRP contract and asked for that time

to suffice.

On October 12, 1999, Brenda Walker at the NHSC sent an email memorializing a telephone conversation she had with Singer. The email states that the NHSC could not accept the time that Singer worked at Wyckoff prior to signing the LRP contract and that Singer would be obligated to fulfill her contract or it would be considered a default.

Singer testified in her deposition that one of the reasons she left her job at Wyckoff was because she was concerned with the work practices of her colleagues. She also claims that she was subjected to harassment because she was the only woman. Singer, however, has not provided any specific information or facts supporting a claim of harassment. Singer further testified that she left her employment at Wyckoff, in part, to study and pass the examination to become a Fellow of the American College of Obstetrics and Gynecology. She believed that the work environment at Wyckoff could have compromised her ability to take and pass the Boards.

On December 10, 1999, Singer wrote a letter to the NHSC stating that she immediately began seeking employment and notified Lester Theophilakos at NHSC of the events. She acknowledged in the letter that she had been informed that she might still have remaining contractual obligations. She stated that she was searching for a "qualifying" position with Theophilakos' help, but that it was difficult because she wanted to find something in the area where she was living and caring for her mother. Singer stated that the NHSC's position was prejudicing her ability to apply for numerous employment opportunities because those opportunities did not meet NHSC's criteria. She again asked for a release or satisfaction from her contractual obligation.

On January 18, 2000, the NHSC denied Singer's request for a release or satisfaction of

her contractual obligations, stating that she could not be given service credit retroactive to the time before her contract was approved. The letter referenced that Singer had been going on interviews at qualifying sites. The letter also stated that Theophilakos would continue to work with her to find a qualifying position at which she could complete her service requirements.

On March 14, 2000, Singer sent a letter to NHSC acknowledging that she left Wyckoff a few months short of the time she was required to work there pursuant to her LRP contract. She also stated that she had looked for qualifying employment for four months but, eventually, took a position at a hospital in the Long Island area that did not meet NHSC criteria. She stated that she was not in a position to pay back the money from NHSC and asked NHSC to consider the full time of her employment at Wyckoff as satisfaction of the two-year requirement.

On May 23, 2000, Theophilakos informed Singer of three openings at a hospital in Brooklyn. Singer declined to take any of the positions because, as she had stated in her previous letter, she had already accepted employment at Southside Hospital on Long Island, which she knew did not meet NHSC criteria.

Singer claims that at some point in 2000 she had a telephone conversation with Jackie Brown, a member of the NHSC loan repayment staff. Singer claims that Brown informed her that her full two years of service at Wyckoff would suffice for fulfillment of her responsibilities under the LRP contract. Brown, however, submitted a Declaration stating that there are no notes or documents in Singer's file to reference the conversation and she does not recall speaking to Singer. Brown states that as an LRP staff member she did not have authority to give service credit for employment outside of the contract time. She states that she would not have told any LRP participant that they could count their pre-contract employment as credited service time.

Brown's Declaration further states that if she and Singer had spoken about waiving the last six months of Singer's service obligation, she would have told Singer that waiver requests were handled by a different office, the Legal and Compliance Branch.  Brown states that her duties at the time did not include processing waiver requests and she did not have authority to grant a waiver.

Singer's LRP contract states: "The Secretary may waive or suspend the applicant's service or payment obligation incurred under this contract if the applicant's compliance with the terms and conditions of this contract is: (a) impossible or (b) would involve extreme hardship and enforcement would be unconscionable."  This provision in the contract is consistent with the statute, 42 U.S.C. § 254o(d)(2), and the regulations issued pursuant to the LRP, 42 C.F.R. § 62.12.  Impossibility requires the LRP participant to "suffer from a physical or mental disability" that results in a permanent inability to perform the requisite service.  42 C.F.R. § 62.12(c).  To determine hardship, the Secretary must consider information and documentation to determine the participants present financial resources and obligations, the participants estimated future financial resources and obligations, and "the extent to which the participant has problems of a personal nature, such as physical or mental disability, terminal illness in the immediate family which so intrude on the participant's present and future ability to perform as to raise a presumption that the individual will be unable to perform the obligation incurred."  *Id.* § 62.12(d).  "Secretary" is defined in 42 C.F.R. § 62.2 as "the Secretary of Health and Human Services and any other officer or employee of the Department of Health and Human Services to whom the authority involved has been delegated."

HHS has a prescribed process for applying for waiver of the service requirement in cases

of impossibility or extreme hardship. The applicable regulation requires an applicant to request a waiver in writing and provide financial and other documentation for the agency to consider. *See* 42 C.F.R. §§ 62.12(b)(1), (d). When the Legal and Compliance Office within the Bureau of Clinician Recruitment and Service of the HHS receives a written request for a waiver, the staff in that office sends the individual a packet explaining the waiver criteria and containing instructions on the medical and financial documents that the applicant needs to submit for processing the formal request.

The parties dispute whether Singer submitted a written waiver request to HHS. Singer contends that her many letters explaining her situation and asking for service credit and a release from her obligations should have been considered as requests for a waiver. Defendants, however, contend that none of these letters actually asked for a waiver and none of the letters contained factual circumstances that would have indicated to an employee at the HHS that a waiver request was being sought.

Brown's Declaration states that it is not the policy or practice of the agency to have an NHSC staff member make waiver decisions on their own. Furthermore, Brown states that it is not agency policy or practice to grant waivers based on telephone conversations. Rather, the separate waiver procedure is followed.

Singer claims that until 2002, she relied on Brown's alleged representations that her obligations had been fulfilled. Singer worked at Southside Hospital on Long Island for approximately two years. In 2001, Singer moved from New York to Park City, Utah, and began a private practice. Park City, Utah is not designated as an underserved area by the NHSC. In August 2002, the DNHSC contacted Singer requesting updated credentials.

On September 9, 2002, the Director of the NHSC wrote to Singer in Park City stating that the NHSC had not heard from her since her letter in March 2000. The letter asked Singer to submit documentation regarding her current practice because she had not fulfilled her contractual obligation. The letter stated that if she believed that her practice would qualify as an approved NHSC site, she should request an application from the Denver Field Office.

Singer replied to the letter the following day. Singer responded by stating that when she left Wyckoff, there was much correspondence between herself and Jackie Brown at NHSC. She stated that she felt that it was understood that she had indeed worked in the full capacity expected of her at Wyckoff even though the LRP paperwork was not finalized until months after she began her employment. Although Singer's letter also stated that Park City is a small town of 48,000, and that she was the only full-time obstetrician, she did not submit an application for NHSC approval of her private practice.

In November 2002, the NHSC wrote to Singer again to see if Singer's current practice site would qualify as a NHSC site. Singer did not submit any documentation. On April 3, 2003, the NHSC assigned Singer to the Denver Reception & Diagnostic Center. Singer did not follow through on the assignment, and the NHSC placed her in default of her LRP obligation.

On May 20, 2003, the Chief of the Legal and Compliance Branch Office of Policy and Planning wrote to Singer. The letter states that Singer is in default of her LRP obligation. The letter also states that the NHSC could not credit her prior work as service under the LRP. The letter states that instead of finding her in default when she left Wyckoff without NHSC approval, the NHSC had tried to identify a transfer assignment for her. The letter states that her employment at Southside could not be counted because it was not an underserved area. The

8

letter further detailed the correspondence between Singer and NHSC and stated that because she was in default, she would hear from the Division of Financial Operations about repaying her debt.

Throughout 2003 and 2004, Singer and NHSC continued to exchange correspondence regarding the fulfillment of her LRP obligations. Singer continued to believe that Jackie Brown had assured her that her obligation had been fulfilled. The NHSC, however, repeatedly told her that it would not count her pre-contractual employment as service under the LRP contract. Singer also states that she wanted to have the NHSC designate her private practice as qualifying NHSC service. The NHSC claims that she was informed of the process that it would take to have such service considered, and Singer never submitted the required application. The NHSC states that it provided Singer with another opportunity to submit an application to have her private practice qualify for NHSC service credit in 2004, but she again failed to submit the application.

During the 2003-04 time frame, Singer made some voluntary payments toward her repayment liability because she wanted to protect her credit. In addition, the NHSC obtained her federal tax refund in 2004 as an involuntary payment. These voluntary and involuntary payments equal approximately $14,426.

In May 2007, Singer sued HHS and NHSC seeking a declaratory judgment that she fulfilled her contractual obligations with NHSC and a return of the payments she had made to NHSC, plus interest, attorney fees, and costs. The United States counterclaimed against Singer seeking judgment for her repayment debt, including pre- and post-judgment interest. The United States claims that Singer owes it the full amount she was paid under the LRP, $50,000, plus

interest, recognizing that she has made some payments to date.

## DISCUSSION

Defendants bring this Motion for Summary Judgment seeking judgment against Singer on her declaratory judgment claim and judgment in favor of the Defendants on their counterclaim. Singer argues that there is a material issue of fact regarding whether her contractual obligation was waived or should have been waived.

### A.  Request for Order of Mediation

In her brief, Singer moved the court, pursuant to DUCivR 16.2, for referral to the court's ADR plan.  The court's ADR plan, however, requires all parties to agree to participation.  Thus, Defendants cannot be ordered into mediation where, as here, they do not believe that mediation would be productive.  Accordingly, Singer's request is denied.

### B.  Dr. Singer's Claims

Defendants contend that Singer does not articulate any legal basis for her declaratory judgment claim.  Defendants, however, assert that she must be asking this court to overturn the HHS's determination that she defaulted on her LRP contract.  If that is the case, Defendants claim that the court should review Singer's claim pursuant to the Administrative Procedures Act ("APA"), 5 U.S.C. § 706(2)(A).

Singer argues that the APA is not applicable because she does not seek review of the NHSC's decision but, rather, seeks to enforce its decision to waive the requirement that she work at Wyckoff until March 2000.  Singer claims that the NHSC can waive an applicant's obligations under the LRP contract and Jackie Brown agreed to such waiver in a telephone conversation with Singer in 2000.   This argument is also Singer's opposition to Defendants' motion on its

counterclaims.

Because summary judgment on Defendants' counterclaim essentially renders the issues with respect to Plaintiff's declaratory judgment claim moot, the court will proceed to analyze Defendants' counterclaim first.

**C. Defendants' Counterclaim**

Defendants contend they are entitled to damages on its counterclaim pursuant to the terms of Singer's LRP contract and 42 U.S.C. § 254o(c)(1). Defendants argue that Singer did not fulfill her two-year contractual service period. Singer's LRP contract and the authorizing statute and regulations clearly state that a participant's pre-contractual employment does not count as service under the contract. In addition, the contract, statute, and regulations clearly provide for the participant's financial responsibilities upon default.

Courts that have considered default situations under the similar NHSC scholarship program have consistently awarded statutory damages to the government. Four circuit courts have examined cases where a health professional failed to serve for the required period of time at an approved site pursuant to the NHSC scholarship contract. Each of the circuit courts has affirmed entry of judgment in favor of the United States as a matter of law. *United States v. Vanhorn*, 20 F.3d 104 (4th Cir. 1994); *United States v. Becker*, 995 F.2d 779, 783 (7th Cir. 1993); *United States v. Melendez*, 944 F.2d 216, 219 (5th Cir. 1991); *Rendelman v. Bowen*, 860 F.2d 1537, 1542 (9th Cir. 1988).

The Fourth Circuit affirmed a district court's ruling against a doctor who did not fulfill the terms of her NHSC scholarship agreement because she left her assigned service site and never received NHSC approval to finish her service at a new site. *Vanhorn*, 20 F.3d at 104. The

court rejected the doctor's arguments about why she left the site, finding that "[r]egardless of her reasons, [the doctor] breached her written agreements with the Government and no reasonable jury could have found otherwise." *Id.* at 114. The Fourth Circuit held that the government needed only to prove that the parties entered into the scholarship contract, the United States provided funding to the doctor pursuant to the contract, and the doctor did not perform the obligation as approved or contracted. *Id.* at 111.

In an unreported case from the United States District of New Mexico, the court granted summary judgment for the government finding that the health professional defaulted on the contract by not performing service at an approved site for the required period of time. *United States v. Umberger*, Civil No. 00-1180MV (D. N.M. April 30, 2001).

It is undisputed that Singer entered into the LRP contract with a specified time period, she received $50,000 for loan repayment, and she left her job at Wyckoff before the contractual period ended on March 17, 2000. In addition, it is undisputed that she has not served at a qualifying NHSC site since leaving Wyckoff. Singer received taxpayer funds for specific service, and she did not perform it. Singer cannot renegotiate the terms of the bargain she struck with the government.

Singer, however, argues that, unlike the scholarship cases above, the NHSC waived the provisions of the LRP contract. And, unlike other contract defenses, waiver is an action contemplated by the terms of the LRP contract. This factual distinction is important because Singer claims that she acted in reliance on Jackie Brown's alleged representations.

In *Vanhorn*, the scholarship recipient alleged the contract had been modified, not waived, and the NHSC was precluded from enforcing it on the basis of substantial compliance and

estoppel.  *Vanhorn*, 20 F.3d at 110.  In *Becker*, the recipient argued not that the NHSC waived the contract but breached it.  *Becker*, 995 F.2d at 782.  In *Melendez*, the recipient challenged the NHSC's denial of his request for waiver, but did not allege that the NHSC had actually waived the contractual obligations.  *Melendez*, 944 F.2d at 219.  In *Rendlemen*, the recipient sought declaratory judgment that he fulfilled his obligation on the basis that the area where he served was ultimately determined to be an underserved area.  *Rendlemen*, 860 F.2d at 1541.  Finally, in *Umberger*, the recipient made no allegation that the NHSC waived the contract.

The cited cases, however, stand for the principle that ordinary contract defenses, including waiver, do not apply to NHSC contracts because the contracts are creatures of statute.  In *Vanhorn*, the doctor was working at an NHSC site that became unable to pay her salary, an NHSC employee told her she could work elsewhere and be in compliance with her contract, and the doctor started a private practice nearby but never applied for or received written approval from the NHSC.  When the NHSC declared the doctor in default of the scholarship contract, the doctor argued "ordinary contract defenses of substantial compliance, estoppel, and economic duress."  *Id.* at 110.  The district court ruled against the doctor and the Fourth Circuit affirmed, holding that "the relationship between Dr. Vanhorn and the Government is governed by statute, and ordinary contract principles do not apply."  *Id.*  Both courts found what an NHSC employee had told the doctor to be irrelevant.  *Id.* at 112.

In *Rendleman*, the Ninth Circuit held that "the plain language of the statute demonstrates that Congress did not intend that contract principles govern the interpretation of the relationship between the Secretary and a scholarship recipient."  860 F.2d at 1542.  And the Seventh Circuit followed this reasoning, noting that "the relationship between an awardee and NHSC does not

arise from a negotiated agreement but is provided for by statute, and thus statutory intent is more relevant to interpret its conditions than common law contract principles." *Becker*, 995 F.2d at 783.

The Fifth Circuit adopted the reasoning in *Rendleman* and examined the statutory language regarding breach of an NHSC scholarship contract. *Melendez*, 944 F.2d at 219. The court concluded that "the punitive nature of the liquidated damage provision set out in §254o(b)" establishes that "Congress intended the obligation of an NHSC participant be fulfilled except in extreme circumstances." *Id.* The court cited the legislative intent to address a serious problem with the distribution of health case: "[I]n the interest of servicing the public policy goals of the statute, the service obligation was intended to be one not easily avoided. The NHSC scholarship program is not intended as a mechanism solely to subsidize health professional education, but as a means to overcome a geographic maldistribution of health professionals." *Id.*

Based on this case law, the only relevant facts are those that are material in the NHSC LRP statutory framework. Singer received the benefit of the contract but did not fulfill the terms of the contract. Singer's claim that Jackie Brown unilaterally granted a waiver is based on the waiver provision of her LRP contract, which mirrors the waiver provisions of the NHSC LRP statute. Singer, however, did not comply with the statutory requirements to request a waiver. She never submitted a written waiver request, and did not provide supporting medical and financial documentation.

Singer claimed at oral argument that Defendants should have construed all of her correspondence as requests for a waiver. This argument, however, places a responsibility on the government that does not exist. Moreover, none of Singer's letters raised issues that would have

put a NHSC employee on notice that she was seeking a waiver. Rather than seeking a waiver of the remaining months of service, Singer asked the agency to consider her obligation fulfilled because of her work at Wyckoff before applying to the LRP. The NHSC repeatedly denied this request in writing. To the extent that Singer's correspondence could be considered a request for a waiver, the requests were repeatedly denied.

Singer claims that Jackie Brown verbally granted a waiver during a telephone conversation, but Brown has no recollection of the call, no record of the call, did not process waiver requests, and had no authority to grant a waiver. Defendants presented evidence that even an agency official who had authority to grant a waiver would not make a waiver determination without the supporting documentation required by the statute. With respect to Singer's argument that the government should be estopped from pursuing repayment because Singer relied on alleged statements by Jackie Brown, the court must conclude that no reasonable finder of fact could conclude that Singer's reliance was reasonable.

Moreover, there is no alleged misconduct on the part of Jackie Brown which is required when asserting estoppel against the government. To claim estoppel against the NHSC, Singer would have to establish all of the elements of ordinary estoppel and that the agency engaged in "affirmative misconduct." *Rios v. Ziglar*, 398 F.3d 1202, 1208 (10th Cir. 2005). There is "an extremely high bar to claims of equitable estoppel against the government." *Kowalcyk v. Immigration and Naturalization Servs.*, 245 F.3d 1143, 1150 (10th Cir. 2001). "When the Government is unable to enforce the law because the conduct of its agents has given rise to an estoppel, the interest of the citizenry as a whole in obedience to the rule of law is undermined." *Id.* at 1149.

The Fourth Circuit also rejected an estoppel argument in *Vanhorn*, in part, because the defense sounded in contract and, in part, because "estoppel against the Government cannot be premised on oral representations." 20 F.3d at 112 & n.19. The court stated that "[t]he Government is simply not bound by the negligent, unauthorized acts of its agents. Federal law is clear that estoppel is rarely, if ever, a valid defense against the Government absent proof of some affirmative misconduct by a Government agent." *Id.* at n.19. Accordingly, Singer's estoppel arguments are without merit.

The undisputed evidence shows that the NHSC did not waive performance of Singer's remaining service obligation. The NHSC worked with her to find a qualifying site in New York, and then tried to get her to submit an application to have her private practice in Park City qualified. While the NHSC spent considerable effort to make it possible for Singer to complete her service requirements, the fact that Singer declined these opportunities does not transform the NHSC's efforts into a waiver. The NHSC repeatedly denied her request to consider her pre-contract employment at Wyckoff. With respect to whether Singer's requests should have been considered as a request for a waiver, there is no legal authority requiring the NHSC to consider such requests as a request for a waiver, the statements in Singer's correspondence did not rise to the level necessary to be considered under the waiver provisions, and there is no evidence that Singer attempted to fulfill the statutory requirements for a waiver.

The court, therefore, concludes that Defendants are entitled to summary judgment on their counterclaims. Singer entered a contract, did not fulfill the requirements of the contract, and has not presented any valid defense. Plaintiff must repay the remaining portion of the $50,000 she received under her LRP contract, with the appropriate interest.

Singer argues that even if she is obligated to repay her loan, she should be credited an amount to reflect her service at Wyckoff. Defendants cite to the LRP contract, the statute, and *Vanhorn* for the proposition that they are entitled to repayment of their loan, plus penalties and interest. Singer, however, states that *Vanhorn* recognizes that NHSC "recipients who do not fulfill their contractual obligations may nonetheless receive credit for service that they have rendered." *See Vanhorn*, 20 F.3d at 113-14.

To give Singer credit for the work she did at Wyckoff, however, would be to rewrite the contract and the statute. The statutory purpose of imposing such drastic liquidated damages is to ensure that the LRP participants fulfill the full term of their service obligations. The court concludes that Singer has provided no legal authority for the court fashioning a remedy that would allow her to receive credit for the work she did at Wyckoff.

Accordingly, the court concludes that Defendants are entitled to summary judgment against Singer on her declaratory judgment claim and in favor on Defendants on their counterclaim. Defendants award, however, shall be reduced by the amount Singer has already repaid.

## CONCLUSION

For the reasons stated above, Defendants' Motion for Summary Judgment is GRANTED. Therefore, this action is dismissed with prejudice, each party to bear its and her own costs.

DATED this 23rd day of July, 2009.

DALE A. KIMBALL
United States District Judge